69328, 69329. DREXEL BURNHAM LAMBERT, INC.
v. CHAPMAN (two cases).
(329 SE2d 595)

BEASLEY, Judge.

Defendant ("Drexel") appeals from the grant of plaintiffs' motions for summary judgment on the underlying claims and the denial of its motions for summary judgment on its counterclaims. The two cases are consolidated for purposes of appeal.

Plaintiffs Mr. and Mrs. Chapman had a brokerage account with Defendant Drexel for a number of years. On February 5, 8, 11 and 13, 1980, Drexel, upon Mr. Chapman's request, sold a total of 3,663 shares of Multimedia stock. On February 11, 1980, upon Mrs. Chapman's request, Drexel sold 792 shares of Multimedia stock. With the proceeds of these sales, Drexel was directed to purchase 1000 shares of Texaco stock for Mr. Chapman and 300 shares of General Motors stock for Mrs. Chapman, which it did. All of these transactions were confirmed by the usual confirmation slips.

Thereafter, the Chapmans received letters from Multimedia dated February 15, 1980, informing them that the corporation had declared a fifty percent distribution of the corporation's common stock, to be accomplished by the distribution to its shareholders of one additional share of stock for every two shares they owned, a 3-for-2 stock split. The additional 1831 shares to Mr. Chapman and 396 shares to Mrs. Chapman were enclosed with the letters, inasmuch as such "dividends" were to be distributed on February 15, 1980, to recordholders as of February 1, 1980. Shortly thereafter, the Chapmans received letters dated February 27, 1980, from Drexel requesting delivery of these stock dividend shares, stating the Chapmans were not entitled to them and they were due Drexel. The Chapmans refused and demanded that Drexel release to them the General Motors and Texaco stock which was purchased upon the Chapmans' request. Drexel refused.

On December 16, 1980, Mr. and Mrs. Chapman respectively filed

suits in trover against Drexel for the delivery of the Texaco and General Motors stock, or alternatively, the cost of the stock, and for return of cash held by Drexel in the account for them. Drexel counterclaimed in trover for the dividend shares of Multimedia stock or, in the alternative, for the value of that stock. It claimed that it was required to deliver the shares to purchasers of the Chapmans' stock who purchased before the ex-dividend date. Both parties were placed under court order not to dispose of any of the stock in question.

This is a case in which reams of words have been used to convey concepts which still elude the understanding of the investors. Whether this opinion will shed any light so as to clarify the situation or will instead result in an incomprehensible explication remains for the parties to judge, but at least an effort will be made and a decision will be reached. *Held*:

1. Drexel asserts that the trial court erred in denying its motions for summary judgment with regard to the counterclaim for Multimedia stock dividends, contending that it is entitled to the Multimedia dividend stock under the rules of the stock market because the Chapmans sold their Multimedia stock before the ex-dividend date. It is undisputed that the "record date" is February 1, 1980, and it is a date selected by the corporation issuing the dividend shares so that it may determine to whom the dividend shares will be sent. The "payable date," here February 15, is the date the certificates are issued. The "ex-dividend date" is the first business day after the corporation actually issues the dividend shares to its shareholders of record. The Chapmans do not dispute that under the NASD rules the ex-dividend date here was February 19, 1980. On the ex-dividend date, the price of the corporation's stock is then adjusted downward because of the increased number of shares on the market. "Ex-dividend" means without the right to the dividend. To get the dividend, the buyer must buy the stock before the date when the stock goes ex-dividend. The Chapmans do not contest this interpretation of the governing rules.

Thus, because the Chapmans sold the Multimedia stock before the ex-dividend date, Drexel maintains, they received the higher, pre-dividend price. Consequently, they had no right to the later-issued dividend shares which diluted the value of each share proportionately.

The Chapmans assert that Drexel is not entitled to the dividend stock because it breached a fiduciary duty by failing to inform them of the ex-dividend date or its effect on their sale of the Multimedia stock, and that they are entitled to it. The Chapmans argue that they intended to sell only their original shares of Multimedia stock and not the dividend shares. They claim that they relied on the express representations of Drexel that this was what they were doing, and that it

was only after the sale of the stock, upon receiving Drexel's letters demanding delivery of the dividends, that they were informed that the dividend shares were included in the transaction.

On a motion for summary judgment, the burden is on the moving party to conclusively negate the existence of all material facts. *Key Professional Systems v. Citicorp Industrial Credit*, 170 Ga. App. 94 (316 SE2d 495) (1984). The evidence is undisputed that under the rules of the stock exchange, because the Chapmans sold their stock before the ex-dividend date, Drexel is entitled to the Multimedia dividends.

The stock dividend was merely a smaller division of the whole than had theretofore existed. The Chapmans had owned a certain percentage of the corporation, as evidenced by the number of shares they held. When they sold those shares, they sold that percentage of ownership. At that time, their percentage of ownership was reflected by 4455 shares. Thereafter, the total ownership of the corporation was divided into a greater number of shares, each of course representing a lesser interest in the corporation and consequently having a proportionately lesser value per share. When the division occurred and the resulting additional shares were issued on February 15, the Chapmans were no longer the owners of the shares which by action of the corporation came to represent a smaller percentage of ownership and thus were not entitled to receive the new shares which would bring their percentage of ownership to full strength. It is somewhat of a misnomer to call it a "dividend" because it is really just a further division of shares in the company's ownership. Nothing concrete is *gained* thereby except that smaller shares, being less costly per share, have a wider market and therefore attract more trading. But when it is issued, the stockholder has the same percentage ownership in the company he had before, relative to all other stockholders. That is why the stockholder cannot sell his larger shares and thereafter receive the smaller shares which are to go to the owner of the larger shares when they are devalued. The letter from Multimedia enclosing the certificates on February 15 contains an explanation of this.

To offer a humble analogy: it is as though the Chapmans owned one-half of a pie which had been cut into eight pieces. They sold their interest in their four pieces. Thereafter, before the pie was distributed, it was cut into twelve pieces. When distributed, the buyer of the Chapmans' four pieces (which had now each been cut in half) would be entitled to the eight half-pieces; the Chapmans would not be entitled to retain four half-pieces just because they sold "four" pieces. The total quantity remained the same. The result, of course, is that each of the eight half-pieces had only half the value of the theretofore-existing whole piece. That is what happened on the ex-dividend date. The stock market at the opening of the next trading date recog-

nized the split and assigned to the shares the diminished value brought about by the proliferation of shares.

Here, the Chapmans confuse the meaning of the "record date" with the meaning of the "payable" and "ex-dividend" dates. When the documents are carefully read, it is without factual or legal dispute that the owner of the record date is not necessarily the owner on the payable or ex-dividend date. The record date establishes only to whom the certificates are *sent*. The ex-dividend date, when the *effect* of the issuance (which occurred the business day before) is recognized and acknowledged on the market, is the date when ownership of the additional shares is determined.

The Chapmans claim that Drexel violated a duty to advise them, when they ordered sales, that the result would be that they would not be entitled to the dividend stocks. However, there is no expert opinion evidence whatsoever to support this theory as to the standard of care, nor any legal support for the existence of such a duty. On the other hand, the confirmation slips evidencing the agreement between the parties, which slips the Chapmans did not challenge or object to, subject the transactions to the rules of the market. These slips specifically set out that "[a]ll transactions are subject to the Constitution, Rules, Regulations, Customs, Usages, Rulings and Interpretations of the exchange, market . . . and of the National Association of Securities Dealers, Inc." Additionally, a person who engages a broker to execute an order on the stock exchange is presumed to have contracted with reference to the rules and established customs of the exchange and to have conferred upon the broker the authority to conduct the dealings in accordance with these rules and customs; the customer is bound by these rules and customs whether or not he has actual knowledge of them. *Bill v. Allen*, 149 U. S. 481 (1892); see also 12 AmJur 2d, § 119. See OCGA § 11-8-319.

Moreover, the Chapmans have ratified the sale of their stock, which brought about a result which they complain about. By suing to recover the *proceeds* of the sale, i.e., the General Motors and Texaco stock, as well as cash left in the account, they thereby must accept the effect of the sale. They cannot affirm part of the transaction and repudiate part of it.

Furthermore, even if the broker was under a duty to advise its clients of the effects of a stock dividend issuance before selling their stock, the Chapmans have presented no evidence that Drexel knew or ought to have known of the stock split at the time of the Chapmans' sale of their Multimedia stock and could have informed them of the ex-dividend date, etc. The Chapmans do not assert that a stock broker is under a duty to inform all clients before a sale of stock of the effects of a corporation's issuance of dividends in anticipation that dividends may later be issued.

In addition, even if Drexel had breached an affirmative duty to inform the Chapmans that sale before February 15 would eliminate their entitlement to the stock dividend, the Chapmans can show no damages. Had they not sold the stock because of such information until after February 15, they would have lost over $5000 due to the lower market price for the stock which had been devalued per share.

Thus, the lower court erred in not granting summary judgment to Drexel, which was entitled to the dividend shares in February 1980. Since it seeks recovery of the shares themselves, it would of course be entitled to any dividends attributable to those shares since that time. OCGA § 44-12-151 (3).

2. Drexel asserts that the trial court erred in granting the Chapmans' motions for summary judgment with regard to the claim for the Texaco and General Motors stock, contending that it has a right to hold the stock as a set-off for its claims to the Multimedia stock dividends. It explains that by not releasing the Multimedia dividends, "the Chapmans had not completed their part of the bargain . . . the Chapmans had not fully paid Drexel Burnham for the General Motors and Texaco stock which it purchased on their behalf."

A set-off can be asserted in a trover action, *Hanover Ins. Co. v. Nelson Conveyor &c. Co.*, 159 Ga. App. 13 (282 SE2d 670) (1981), and a counterclaim for trover can be asserted against a complaint for trover, as in the present case. *Arnold v. Wilson*, 156 Ga. App. 448 (274 SE2d 804) (1980).

The Chapmans deny that Drexel has the legal title or "right of possession" to the Texaco and General Motors stock necessary to recover in trover. See *Charles S. Martin Distrib. Co. v. Banks*, 111 Ga. App. 538 (142 SE2d 309) (1965). Thus, they conclude that summary judgment was properly granted.

" 'A cash customer, as distinguished from one who has purchased stock on margin, is entitled to the delivery of stock purchased for him, and in the absence of an agreement or instructions to the contrary, the broker undertakes and agrees to deliver the stock to the customer either immediately or in such time as is necessary to effectuate the transfer and is reasonable under the circumstances . . . If a broker refuses to make delivery upon demand . . . he is liable for conversion.' " *E. F. Hutton & Co. v. Weeks*, 166 Ga. App. 443, 445 (304 SE2d 420) (1983).

Although the Chapmans were "cash customers," they were not entitled to the delivery of stock. An express agreement was made to the contrary. Here the parties agreed that Drexel was to purchase Texaco and General Motors stock with the proceeds from the sale of Multimedia stock. In effect, the agreement reached was that Drexel would deliver the Texaco and General Motors stock to be purchased on the Chapmans' behalf upon receiving the proceeds from the Mul-

timedia stock was authorized. To hold to the contrary would yield the undesirable result of ensuring litigation by requiring Drexel to turn over stock to the Chapmans not yet fully paid for, and only then allowing it to recover the money owed by bringing a separate lawsuit.

For these reasons, the trial court erred in granting the Chapmans' motions for summary judgment with respect to their claims to the Texaco and General Motors stock.

*Judgment reversed. Birdsong, P. J., and Carley, J., concur in the judgment only.*

DECIDED MARCH 14, 1985 —
REHEARING DENIED MARCH 29, 1985 — 

*David W. Porter, David A. Rabin,* for appellant.
*Frederick C. McLam, Lynn Russell,* for appellee.